## MAY *v.* STEAM-SHIP POWHATAN, etc.

*(District Court, E. D. New York.* ———, 1880.)

1. NEGLIGENCE — COMMON CARRIER — CONTRACT. — A common carrier cannot, by any form of contract, relieve himself from the consequences of his own negligence.

2. SAME—CATTLE—WIND-SAILS.—It is negligence for the owners of a vessel to permit the same to lie at a pier with the between-decks full of cattle, during a hot July day, without having any wind-sails up.

3. SAME—SAME—SAME.—If it was necessary for the vessel to lay at the pier during the day, and if it was impossible to use wind-sails with success while the vessel remained at the pier, then it was the duty of those in charge of the vessel to inform the owner of the cattle of those facts, and to keep the cattle in a proper place upon the pier until the vessel was about to move.—[ED.

BENEDICT, D. J. This action is brought to recover for damage done to a shipment of cattle while being transported on the steam-ship Powhatan from New York to Bristol, England, in July, 1878.

The cattle came to the steam-ship at pier 40, East river, on the morning of Sunday, the seventh of July, in two divisions. The first division were all on board the steamer by about 9 o'clock A. M.; the second division arrived soon after and went on board at once, so that all the cattle were on board before 10 o'clock A. M. One hundred and twenty-nine were put in the between-decks and the rest on deck. The day was hot, the thermometer at the signal office registering 75 deg. at midday. After the cattle were on board, the steam-ship lay at the pier until 3:30 P. M., when she proceeded to sea. On Monday morning following, two of the cattle in the between-decks were found dead. On Tuesday morning six more of the cattle in the between-decks were dead, and nearly all in the between-decks were sick. On Wednesday morning eight more were dead in the same place, and two more died during that day in the same place, making 18 in all. Then the mortality ceased and the health of the cattle improved. All the rest of the cattle, except one of those on deck, which died later from cramps, arrived in safety. The condition of the cattle landed from deck was about as good as when shipped. Those that survived in the between-decks, when landed, had lost condition, and were diminished in value. The libellant now seeks to recover of the steam-ship for the value of the cattle that died in the between-decks, and for the diminution in value of those in the between-decks that survived.

The law applicable to the case is not in dispute. Under the terms of the contract, the libellant, in order to recover,

must show that the loss complained of was caused by negligence on the part of the ship.

The evidence shows that this steam-ship was built for the fruit trade, and its construction intended to render the between-decks uncommonly well ventilated. The hatches were unusually large, and they were continually open during the voyage in question, the weather having been fine from the time of sailing until arrival in Bristol. There is no room, therefore, to contend on the one side that the loss in question was occasioned by any defective construction of the steamer, nor, on the other, that the sickness and mortality in the between-decks arose from a confinement caused by stress of weather, and was therefore a necessary result of the attempt to transport the cattle in the between-decks. But it is claimed on the part of the libellant that the sickness and mortality were caused by the omission to furnish a sufficient supply of air to the cattle in the between-decks by the use of wind-sails in the hatches; while on the part of the ship it is insisted that the sole cause of the loss was the overheated condition of the cattle when shipped. In support of the libellant's claim, evidence has been given whereby it sufficiently appears that the use of wind-sails to convey air to cattle when carried between-decks, is a precaution commonly resorted to for that purpose, the omission of which, when practicable and available for the purpose intended, is negligence. The libellant has also produced two witnesses, cattle men, employed by the libellant, who had charge of the cattle during the voyage, and who swear positively, and with detail, that no wind-sails were put up until the Wednesday morning after leaving New York.

It will be recollected that the cattle went on board the steamer early Sunday morning. On Sunday night the mortality commenced, continued on Monday and Tuesday, and ceased suddenly on Wednesday. The sickness was confined to the animals in the between-decks, and there is no evidence to justify a supposition that it was the result of any disease that broke out among the cattle, nor has such a supposition been made. It is also certain that the loss was not the result of the ordinary fatigue of the voyage, for the sickness was

confined to the first three days. If, then, it could be considered to have been proved that wind-sails were for the first time put up on Wednesday, the third day out, there would be little difficulty in arriving at the conclusion that the absence of wind-sails on Sunday, Monday, and Tuesday was the cause of the sickness and death that ensued. But while it is conceded on the part of the steamer that no wind-sails were put up until the vessel was passing down the bay, two witnesses are produced from the steamer who swear that before the steamer passed Sandy Hook twelve wind-sails were put up to convey air to the between-decks. Upon the question whether wind-sails were used during Sunday night, Monday, Tuesday, and Tuesday night, we have, then, four witnesses, all of them possessed of sufficient intelligence to observe the fact, all of them called on by the nature of their duties to know when wind-sails were up, and each of whom must of necessity know how the fact was; and yet the two cattle men swear positively that no wind-sails were up until Wednesday morning, and the master and mate of the steamer swear as positively that twelve wind-sails were up from the time of passing Sandy Hook.

In regard to this conflict of evidence, which presents a plain question of veracity, it must be remarked on the one hand that the testimony of the cattle men discloses a desire to make out a strong case against the steamer, and there is considerable improbability in their statement that the master of this steam-ship, although often requested, and when the necessity was obvious, refused to put up wind-sails until Wednesday; and this, too, when he had plenty of them on board, and, for all that appears, could have put them up at once without trouble. Such neglect would be gross indeed, and requires to be clearly proved. Moreover, some of the statements of the cattle men, such as that all permanent ventilators were closed up, have been clearly disproved. On the other hand, the master and mate of the steamer, who contradict the cattle men, testify in regard to a neglect, which, if it existed, is chargeable to them, and they cannot be considered as free from a bias in favor of the steam-ship.

I pass the testimony of the second and third mates with the remark that their statements are so general in character as to have little weight in so sharp a conflict; and with the further remark that it is not without significance that so important a fact as the time when wind-sails were put up should have been left, on the part of the steamer, to be decided upon the testimony of the master, and mate unsupported except by such general statements as are made by the second and third mates. The testimony of the Sandy Hook pilot, who says that he has no recollection in regard to wind-sails, but thinks that if no wind-sails had been up he would have remarked the circumstance, as he knew that she had cattle in the between-decks, affords but little support to the master and mate; for it would seem that it could hardly be that twelve wind-sails could have been rigged on the steamer while she was passing down the bay without attracting the attention of the pilot in charge. Still, I must say that I have not been convinced that no wind-sails were up until Wednesday. The only omission on the part of the ship that can be deemed proved is the omission to have wind-sails up during Sunday, while the steamer lay at the pier.

The case, then, presents two questions: *First,* whether it was negligence on the part of this ship to permit their vessel to lie at the pier with the between-decks full of cattle, during Sunday, without any wind-sails up; and, *second,* whether the subsequent sickness and death in the between-decks is attributable to that omission.

The evidence hardly admits of doubt that a reasonable care for the health of the cattle in the between-decks required that wind-sails should have been put up as soon as the cattle were on board. It was a hot July day; the steamer was an iron vessel; she was lying in the slip along-side a shed; the cattle filled the between-decks very full; the heat there was extraordinary; the animals were suffering greatly, so much so that fears were expressed that all would die, and the necessity for wind-sails was called to the attention of the mate in charge by an agent of the Society for the Prevention of Cruelty to Animals, who was present for the purpose of

observing the treatment of the cattle. Notwithstanding which, no attempt was made to furnish more air to the cattle until after the steamer had left the pier and was proceeding down the bay. It has been attempted to be shown by the mate that wind-sails would have been of no avail to throw air into the between-decks while the steamer lay at the pier, but it is quite manifest, from his testimony, that this was not the reason for his omission sooner to get up the wind-sails. He gave no such reason to the agent of the society when told that wind-sails were needed at once, and the evidence in regard to the breeze then blowing, and the position of the ship, disproves the assertion that wind-sails would have been of no use while the vessel was at the pier.

It has been contended that the detention of the steamer at the pier during Sunday was caused by the failure of the cattle to arrive at the hour designated, and so compelled the steamer to lose the morning tide and to lie at the pier during Sunday; it having been sworn, without contradiction, that it was not possible for the steamer to get away from the pier except upon a slack tide. But the evidence fails to show that the failure of the steamer to get out on the morning tide was caused by a failure of the cattle to arrive at the appointed time; and, if such had been the fact, it is not seen how it could excuse any subsequent omission to use reasonable care in regard to the animals after they were on board.

Furthermore, if it was impossible for the steamer to leave the pier except on slack water, it was known to those in charge of the steamer when the cattle came that the steamer was to lie at the pier until after 3 o'clock in the afternoon; and if it were true, as the mate says, that it was impossible to use wind-sails with success while the steamer lay at the pier, it became his duty to inform the owner of the cattle of the fact that the steamer was to lie at the pier during the day, and to keep the cattle under the shed upon the pier until the vessel was about to move, instead of putting them in the between-decks of an iron vessel intending to lie still in a place where wind-sails would be of no avail, in a broiling sun, during the whole of a July day.

The next question to be considered is whether the condition of the between-decks during Sunday was the cause of the sickness and mortality among the cattle in the between-decks. The mortality commenced on Sunday night and continued until Wednesday, and it has been proved on the part of the ship that the effects of overheating in cattle often appear some days after the heating. Therefore, inasmuch as there is no evidence tending to show the presence of disease among the cattle in question, and no claim on the part of the steamer that there was any other cause of the sickness and mortality except the heated condition of the cattle on Sunday morning, the case in its present aspect must turn upon the question of fact, whether the cattle that were put in the between-decks were in an overheated and exhausted condition when shipped. If such was their condition, the fair inference would be that the subsequent sickness and mortality arose from that condition. If such was not their condition, the subsequent sickness and mortality must be attributed to the heat and suffocation of the between-decks during Sunday, there being no evidence of any other sufficient cause. Upon the question of fact thus presented I am of the opinion that there was no heat or exhaustion of the cattle, when shipped, to cause sickness or account for the deaths in the between-decks. The cattle had been in the yard for a week or so while waiting for the steamer, and were well rested. They were driven only a mile and a half on the day of shipment, and that early in the morning. They came to the steamer in two divisions. As to the first division, all agree that the cattle composing it were in proper condition for shipment. As to the second division there is direct evidence that the cattle comprising it had become overheated and exhausted, and equally positive evidence that they were not in such condition. But the weight of evidence is with libellant. In the first place, the bill of lading, which was signed after all the cattle were on board, makes no mention of anything wrong in the appearance of the cattle. If the cattle had been in the overheated and exhausted condition described by the witnesses for the steamer, it would seem probable that some mention of the fact would have been

made in the bill of lading.    But the bill of lading is clean, and there is no evidence of any complaint whatever from the ship at the time, as to the condition of the cattle when going on board,    In the next place, it is improbable that the owner of the cattle, who was shipping them to be sold abroad on his own account, and who was personally present attending to their shipment, would have brought them to the pier or permitted them to go on board the vessel in an over-heated and exhausted condition.    Inquiry would have informed him that the steamer was not to leave on the morning tide, and, if his cattle had become overheated, is there any doubt that he would have endeavored to delay their going on board until the last moment?    Furthermore, the short distance which the cattle had come, the time taken in the driving, the early hour of the day, do not acccount for such a condition of the cattle as is described by the claimant's witnesses.    That there was some heat is not doubted, and that from two to five of the cattle fell down and had water poured on them is proved, out of which circumstance the witnesses have made as much as possible; but the weight of the direct evidence in regard to the condition of the cattle,—one of the witnesses who proves the absence of exhaustion or undue heat being an agent for the Society for the Prevention of Cruelty to Animals, without interest in the controversy, and present for the purpose of observing the condition of the cattle,—together with the undisputed facts, forbid the conclusion that the condition of the cattle when put into the between-decks had anything to do with the subsequent sickness and mortality.

It should be further remarked that there is evidence from the libellant himself that only cattle composing the first division, and which the claimant's witnesses say were not overheated, went into the between-decks.    This testimony, if true, disposes of the question of overheat or exhaustion, and leaves the condition of the between-decks on Sunday the only visible cause of the subsequent sickness, because the sickness was confined to cattle in the between-decks.    Here, again, however, an important point, as to which many witnesses

could speak, is left in doubt by the testimony of a witness from the steamer, who contradicts the libellant, and says that some 30 of the cattle in the second division went into the between-decks. But, aside from this statement of the libellant, there is sufficient evidence to compel the conclusion that the cattle in the between-decks, when shipped, were not overheated or exhausted, and that the subsequent sickness and mortality during the first three days of the voyage can be attributed to no other cause than the detention of the cattle during Sunday in the between-decks, rendered unnecessarily hot and unhealthy by the fact that the steamer lay along-side the pier and without wind-sails up.

From this conclusion the liability of the steamer must follow, notwithstanding the provision in the contract that the vessel was not to be responsible for any mortality whatever; for it is settled that a carrier cannot by any form of agreement relieve himself from the consequences of his own negligence.

A decree must therefore be entered in favor of the libellant, with an order of reference to ascertain the amount of the loss.

NOTE. See *Ormsby* v. *U. P. R. Co.* 4 FED. REP. 706.